IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:12-CR-156 |
| ) | (PHILLIPS/SHIRLEY) |
| BARRY EUGENE EVANS, ) | |
| ) | |
| Defendant. ) | |

### REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case was before the Court on February 28, 2013, for a suppression hearing on the Defendant's Motion to Suppress and Memorandum in Support [Doc. 19], filed on February 5, 2013. Assistant United States Attorney Cynthia F. Davidson appeared on behalf of the Government. Assistant Federal Community Defender Paula Voss appeared on behalf of Defendant Evans, who was also present. The Government presented the testimony of Officer Jajuan Hamilton with the Knoxville Police Department ("KPD"). At the conclusion of the hearing, the Court granted the Defendant's request for leave to file post-hearing briefs. The Defendant filed his brief [Doc. 24] on March 6, 2013. The Government filed its responsive post-hearing brief [Doc. 25] on March 8, 2013. The Court took the motion, responses, testimony, exhibits, and post-hearing briefs under advisement on March 9, 2013.

# I. POSITIONS OF THE PARTIES

The Defendant is charged with one count [Doc. 1] of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). This charge stems from November 11, 2012, when two officers detained the Defendant and conducted a pat-down search.

The Defendant argues that the officers violated his Fourth Amendment rights to be free of warrantless searches and seizures. He contends that the officers seized him and conducted a pat-down search without having reasonable suspicion that a crime had been committed. The Defendant asserts that any evidence derived from the illegal search and seizure should be suppressed.

The Government responds that the officers had reasonable suspicion to believe that criminal activity was afoot. In addition, the Government argues that the pat-down search of the Defendant was necessary to ensure officer safety and that any physical evidence obtained should not be suppressed.

# II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

The Government presented the testimony of one witness: KPD Officer Jajuan Hamilton.

Officer Hamilton testified that he has six years of law enforcement experience and has been a police officer with KPD for almost two years. He stated that he patrols and answers calls for service by dispatch. On November 11, 2012, he was dispatched to the Dollar General Store on the corner of Middlebrook Pike and University Avenue. He testified that the dispatcher stated that there was a man with a gun and gave the following description: black, bald, and was wearing

2

Case 3:12-cr-00156-TWP-CCS   Document 26   Filed 04/08/13   Page 2 of 17   PageID #: 89

a black hoodie[1] with white writing on it. When Officer Hamilton arrived within the vicinity of the Dollar General Store, he saw a man who he said fit the description given by dispatch. Officer Hamilton testified that he told the Defendant about the dispatched call and then attempted to pat him down, but the Defendant resisted. Officer Hamilton grabbed the Defendant's arm and advised him that he was going to proceed with a pat-down search. Officer Hamilton's partner, Officer Charlie Winstead, grabbed the Defendant's other arm. The Defendant continued to resist, and an altercation ensued. Officer Hamilton testified, "We ended upon the ground during the altercation." [Tr. 6]. Officer Hamilton attempted to tase him, but the Defendant pulled both prongs out. The officers saw a gun in the Defendant's back pocket, but Officer Winstead was able to take it before the Defendant fled on foot. Officer Hamilton testified that he ran after the Defendant but lost sight of him.

The Government entered Exhibit 1, the audio of the dispatcher, into evidence. On the audio, the dispatcher actually described the black male as bald headed, wearing black jeans, smoking a cigarette and that he had just ran out of the Dollar General Store and was heading towards Squire's Liquor. At first, the dispatcher was not sure as to what Dollar General Store the callers were referring. When Officer Hamilton saw the Defendant walking, he called the dispatcher back to confirm the description. The dispatcher this time described the unidentified male as black, bald headed, wearing a black sweatshirt with white writing and was smoking a cigarette. In addition, Officer Hamilton stated that he called dispatch while pursuing the Defendant. He testified that while chasing the Defendant, he was unaware that Officer Winstead had grabbed the gun from the Defendant's back pocket. The Government entered Exhibit 2, the police cruiser video, into evidence.

---

[1] Per the actual tapes made exhibits, the dispatcher actually says "black sweatshirt," a fact Officer Hamilton would later tacitly concede.

3

On cross examination, Officer Hamilton testified that he made a left turn on Western Avenue and then turned onto University Avenue, where the altercation ultimately took place. Officer Hamilton testified that the words "10/90 with a gun," reported by the dispatcher means that there is a suspicious person with a gun. Officer Hamilton asked the dispatcher what the male was doing with the gun, but the dispatcher stated that she was not sure and that the callers only reported that a male had a gun in his back pocket and was walking around. The dispatcher gave the aforementioned general description of what the black male looked like (i.e., bald, black sweatshirt with white writing, smoking cigarette) and also stated that the male was heading towards Squire's Liquor. Officer Hamilton saw the Defendant walking on the corner of University and Western Avenues. Officer Hamilton testified that the Defendant was wearing a black hoodie and had a white towel around his neck. He could not see if the Defendant was bald or had dreads because the Defendant had his hood on over his head. The dispatcher did not say anything about the unidentified man having a white towel around his neck.

Officer Hamilton testified that he and Officer Winstead were not in the same cruiser, but Officer Winstead was in a police cruiser behind him and that they both parked on the curve towards University Avenue. Both officers approached the Defendant from behind. Officer Hamilton asked the Defendant what was going on and whether he was just at the Dollar General Store. The Defendant responded that he was not. Officer Hamilton then told the Defendant he was going to pat him down.

When defense counsel asked what crime he suspected the Defendant of committing, Officer Hamilton testified, "I suspected him of having a weapon." [Tr. 18]. Officer Hamilton conceded that merely possessing a gun is not illegal in Tennessee and that he did not even see a

4

weapon when he approached the Defendant. When Officer Hamilton grabbed the Defendant's arm, the Defendant told Officer Hamilton not to grab him. Officer Winstead then grabbed the Defendant's other arm, and the officers demanded a pat-down search. The Defendant repeatedly told the officers to let him go. Officer Hamilton testified that initially the Defendant did not try to pull a gun on them but claimed he attempted to during the altercation. Officer Hamilton stated that he did not really make an effort to talk with the Defendant before grabbing his arm because dispatch had received two telephone calls reporting a male with a gun who he claimed matched the Defendant's physical characteristics. When the Defendant fled, he actually did not have a gun with him, but Officer Hamilton was unaware of that fact during the pursuit. Defense counsel entered into evidence Exhibit 3, a map of the area showing where Officer Hamilton drove, the location of Squire's Liquor, the Dollar General Store, and the area where the Defendant was stopped.

On redirect examination, Officer Hamilton testified that the front door to the Dollar General Store is facing Middlebrook Pike and that someone calling from the Dollar General Store would describe a person heading towards Squire's Liquor or University Avenue (where the Defendant was found) as the same direction.[2] In addition, Officer Hamilton testified that it is legal to carry a concealed gun in Tennessee as long as the person carrying the gun has a handgun carry permit. He stated that he is permitted to investigate whether someone has a permit.

On recross examination, Officer Hamilton testified that he is allowed to ask for a permit, but did not testify that he asked the Defendant about a permit. At the time of the stop, Officer Hamilton stated that he did not see a gun on the Defendant and that he approached the Defendant

---

[2] However, the Court notes the maps indicate that where the Defendant was stopped on University Avenue is directly north (or left) of the Dollar General Store's front door—whereas, Squire's Liquor is east and behind the Dollar General Store.

"to see if he had a weapon due to two 911 callers being alarmed enough to contact police." [Tr. 26-27]. He conceded that he was not looking for a handgun permit.

Finally, the Government entered into evidence Exhibit 4, a map of the area and the front door of the Dollar General Store.

### III. FINDINGS OF FACT

Based upon the testimony and exhibits presented at the February 28 hearing, the Court makes the following findings of fact:

During the day on November 12, 2012, Officer Hamilton was dispatched to the Dollar General Store on Middlebrook Pike because two people had contacted the police and reported a male with a gun in the store. The dispatcher reported a "10/90 with a gun," which means a suspicious person with a gun. At first, the dispatcher was confused as to which Dollar General Store the callers were referring. The dispatcher gave the following description of the unidentified male: black, bald, wearing a black sweatshirt with white writing on it, black jeans, and smoking a cigarette. The dispatcher also stated that the male was heading towards Squire's Liquor. Officer Hamilton asked the dispatcher what the male was doing with the gun, and the dispatcher stated that she unsure and that the callers only stated that the male had the gun in his back pocket and was walking around.

Officer Hamilton, answering the call, turned onto Western Avenue and drove past Squire's Liquor headed toward the Dollar General Store. He then saw the Defendant to his right, wearing a black hoodie with a white towel around his neck. The evidence did establish that the Defendant was wearing a black sweatshirt with white writing, nor that he was bald, nor that he was a smoking cigarette, nor that he was wearing black jeans. Additionally, the Defendant was

6

walking along University Avenue, which is not towards Squire's Liquor as stated by the dispatcher. Officer Hamilton and Officer Winstead, who was driving behind Officer Hamilton, both pulled off Western Avenue to the right and onto University Avenue—stopping their police cruisers on the curve onto University Avenue. Officer Hamilton walked up behind the Defendant and immediately asked him what was going on and whether the Defendant had recently been at the Dollar General Store. Although the Defendant replied that he had not, Officer Hamilton told the Defendant about the telephone calls to the police and stated that he was going to pat the Defendant down for weapons. Officer Hamilton did not articulate a crime he believed was being, or had been, committed. Officer Hamilton immediately grabbed the Defendant's arm. The Defendant resisted and repeatedly requested that Officer Hamilton let him go. Officer Winstead then assisted and grabbed the Defendant's other arm. The Defendant continued to resist, and an altercation ensued.

Officer Hamilton attempted to tase the Defendant, but the Defendant pulled both prongs out. The officers saw a gun in the Defendant's back pocket, but Officer Winstead was able to take it before the Defendant fled on foot. Officer Hamilton ran after the Defendant but lost sight of him. In addition, Officer Hamilton was unaware that Officer Winstead had taken the Defendant's gun before the Defendant fled on foot.

### IV. ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212,

216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant to reasonably believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir. 1985). Furthermore, an officer may stop a person only if he or she "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." United States v. Johnson, 620 F.3d 685, 690 (6th Cir. 2010) (quoting United States v. Place, 462 U.S. 696, 702 (1983)).

In his motion, the Defendant argues that he was improperly seized in violation of his Fourth Amendment rights because the officers lacked reasonable suspicion to detain him. The Defendant contends that the encounter with the officers was an illegal seizure at its inception and that all the evidence obtained as a result of his illegal detention and pat-down search must be suppressed.

The Government responds that the officers had reasonable suspicion to believe that criminal activity was afoot. In addition, the Government argues that the investigatory pat-down was proper to ensure the safety of the officers and to investigate the report of possible criminal activity.

The Court will first analyze at what point during the incident the Fourth Amendment was implicated. Next, it will analyze whether the police had reasonable suspicion to seize the Defendant.

### A. Timing of Seizure

An officer does not need reasonable suspicion before approaching an individual to simply make an inquiry. United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007); see also Florida v. Royer, 460 U.S. 491, 497 (1983) (noting that the Fourth Amendment is not violated when an officer approaches an individual on the street and asks him/her questions). However, the Fourth Amendment is implicated once a person has been seized. Johnson, 620 F.3d at 690. The test for when an individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990). The Supreme Court has enumerated certain factors that can indicate a seizure:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980); Smith 594 F.3d at 536.

In this case, the Court finds that the Defendant was clearly seized when Officer Hamilton grabbed his arm. When the officers first approached the Defendant, Officer Hamilton simply asked the Defendant a question, and no seizure had occurred. See Campbell, 486 F.3d at 954.

9

Immediately afterwards, however, Officer Hamilton grabbed the Defendant's arm. At this point, a reasonable person would not feel free to leave. See Chesternut, 486 U.S. at 573. In fact, the Defendant requested that Officer Hamilton not grab him and resisted, but Officer Winstead grabbed his other arm. The Defendant repeatedly told the officers to let him go, but the officers insisted on continuing to detain him and attempting to conduct a pat-down search. Accordingly, the Court has no hesitation in finding that the Defendant was seized, and the Fourth Amendment was implicated, when Officer Hamilton grabbed the Defendant's arm.

The Court must next determine whether the seizure of the Defendant was a permissible one.

### B.     Terry Stop

The Defendant argues that at the time he was seized, the officers lacked reasonable suspicion to conduct an investigatory stop. The Government argues that the officers had reasonable suspicion to believe that criminal activity was afoot.

Determining whether an investigatory stop comported with the Fourth Amendment is a two-step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. Id. The Court will first determine whether the officers had reasonable suspicion to conduct an investigatory stop of the Defendant.

10

## *(1) Reasonable Suspicion*

A police officer may briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Id. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397. The Court evaluates the reasonableness of the officer's suspicion in light of the totality of the circumstances surrounding the stop. See United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274.

In Florida v. J.L., there was an anonymous tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. 529 U.S. 266, 268 (2000). Approximately six minutes later, officers observed a male matching that description at the bus stop and conducted a Terry stop. Id. "Apart from the tip, the officers had no reason to suspect illegal conduct." Id. In addition, "[t]he officers did not see a firearm, and J.L. made no

11

threatening or otherwise unusual movements." Id. In holding that the tip alone did not provide reasonable suspicion, the Supreme Court stated:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

Id. at 272. The Court finds that the instant matter is analogous to J.L.

At the time Officer Hamilton seized the Defendant, Officer Hamilton had only been told by the dispatcher that there was a suspicious male with a gun at the Dollar General Store, that the male was reportedly heading towards Squire's Liquor, and a description was given of the unidentified male indicating he was a black male, bald, wearing black sweatshirt with white lettering and smoking a cigarette. Officer Hamilton saw a man whom he claimed matched the description given by the dispatcher. Officer Hamilton approached and asked the Defendant if he had recently been at the Dollar General Store. The Defendant replied that he had not. Without asking any additional inquiries, the officers immediately seized the Defendant and insisted on conducting a pat-down search. At the time the Defendant was detained, the totality of the circumstances included: (1) two calls placed to 911 reporting only that a male with a gun was at the Dollar General Store, (2) the above description of the male, and (3) the way he was heading. Based upon the totality of the circumstances, the Court cannot find that the officers had reasonable suspicion to detain the Defendant.

12

The weight given to the 911 calls in determining whether there was reasonable suspicion turns on the "content and reliability of the call." Johnson, 620 F.3d at 694. The Supreme Court has recognized a distinction between a report from a known citizen eyewitness and an anonymous tip. See Illinois v. Gates, 462 U.S. 213, 233-34 (1983). "[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary." Id. (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)). On the other hand, an anonymous tip is insufficient by itself to provide reasonable suspicion to stop the person described. J.L., 529 U.S. at 27-71.

In the present matter, whether the 911 callers identified themselves is unknown. Although both parties state in their post-hearing briefs, that one of the callers was the manager of the Dollar General Store, the Court heard no evidence of this at the suppression hearing. The Court, however, gives the reliability of the calls some weight simply because two similar calls were placed. In addition, the dispatcher was given a general physical description of the unidentified male. See Johnson, 620 F.3d at 694 (noting that the police had no descriptive information of the suspect); see also J.L., 529 U.S. at 272 (stating that an accurate description of the suspect's location and appearance helps police correctly identify the person whom the tipster means to accuse). On the other hand, the phone calls asserted no illegal activity. Johnson, 620 F.3d at 694 ("Reasonable suspicion 'requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person.'") (emphasis in original) (quoting J.L., 529 U.S. at 272); see also Feathers v. Aey, 319 F.3d 843, 846 (6th Cir. 2003) (noting that the "tipser did not even allege any criminal activity"). Officer Hamilton asked the dispatcher what the male was

13

doing with the gun, but she stated that she was not sure and noted that the callers had only stated that the male had a gun in his back pocket and was walking around.

Even assuming the identities of the callers had been known, the Court cannot agree with Officer Hamilton's claim that the description of the unidentified male reasonably matched the Defendant in this case. First, when observed by the officers, the Defendant was not heading towards, nor in the direction of, Squire's Liquor as was reported by the dispatcher. He was actually found on the opposite side of the road walking in a direction away from Squire's Liquor. In addition, there are several differences between the physical description given by the dispatcher and the Defendant. For instance, the dispatcher stated that the male was smoking, but there was no testimony at all that the Defendant was or had been smoking when Officer Hamilton observed and approached him. The dispatcher stated that the male was wearing a sweatshirt, but the officer testified that the Defendant was wearing a hoodie. The dispatcher also stated that the male's sweatshirt had white writing on it and that he was wearing black jeans, but again, there was no testimony that the Defendant's hoodie had any white writing on it or that he was wearing black jeans. The Court also notes that the dispatcher reported that the unidentified male was bald. Neither officer testified the Defendant appeared bald and from the Court's own observation, the Defendant had a significant amount of hair (dreadlocks) at the Court hearing. Officer Hamilton testified that when he saw the Defendant walking, the Defendant had his hood on and that he could not see if he was bald or had dreads. The Government's attorney argued in her brief, "The defendant has a receding hairline. When the defendant was wearing the black hood over his head, it is an accurate description to describe him as balding." [Doc. 25 at 4]. The Court notes that there is no stated basis for this factual allegation, and furthermore, the Court notes neither

14

officer testified to such allegation. Finally, Officer Hamilton stated that the Defendant had a white towel around his neck, a notable characteristic that was not given by the dispatcher.[3]

Furthermore, like the defendant in J.L., the Defendant did not make any unusual movements or try to flee when the officers approached him. In fact, he stopped and answered Officer Hamilton's question. Officer Hamilton then immediately grabbed the Defendant and tried to pat him down, and even tried to tase the Defendant. The Court finds that the circumstances were insufficient to allow an officer to reasonably suspect the Defendant of criminal activity.

Moreover, while the Government asserts in its brief that the officers had reasonable suspicion that criminal activity was afoot, neither it nor the officers could articulate what they believed was afoot. Officer Hamilton testified when asked what crime he suspected the Defendant of committing, only that he "suspected him of having a weapon." [Tr. 18]. Officer Hamilton also stated, however, that he did not even see a weapon when he approached the Defendant and that he was not checking for a gun carry permit. Finally, at the hearing, the Government asserted that it is illegal to possess a gun as a convicted felon. While this is true, there was no evidence or testimony that Officer Hamilton knew the Defendant was a convicted felon or even asked whether he had a weapon.

Although Officer Winstead ultimately seized a gun from the Defendant during the struggle, this does not suggest that the officers, prior to the frisk, had a reasonable basis for suspecting the Defendant of engaging in unlawful conduct. The reasonableness of their suspicions and actions are measured by what they knew before they detained the Defendant. See

---

[3] In addition, there were no "contextual considerations" in the present matter. Caruthers, 458 F.3d at 465 (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). The incident took place during the day and there was no testimony that it occurred in a high-crime area or that the Defendant was running away.

J.L., 529 U.S. at 271. Accordingly, the Court <u>cannot</u> find that there was reasonable suspicion to suspect the Defendant of criminal activity, nor was such reasonable suspicion established by articulable facts. <u>See</u> <u>Johnson</u>, 620 F.3d at 692 (finding no reasonable suspicion even though officers were responding to a 911 call; it was 4:00 a.m.; officers observed the defendant near the residence; the officers did not notice anyone else in the area, besides the driver of the car to which the defendant was heading; the defendant did not stop when called to by the officers; and the defendant was carrying a bag, which he threw in the car). As such, because the Court finds that there was not reasonable suspicion of criminal activity, the Court need not address the validity of the subsequent pat-down search of the Defendant.

Since the discovery of the handgun was the product of an illegal seizure and search, the exclusionary rule prevents its use as evidence in this case. <u>United States v. Alexander</u>, 540 F.3d 494, 501 (6th Cir. 2008).

## V. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds that there was no reasonable suspicion to stop and conduct a pat-down search. The Court recommends that the evidence produced from the illegal search and seizure be suppressed. For the reasons set forth herein, it is **RECOMMENDED** that Defendant Evans's Motion to Suppress and Memorandum in Support [**Doc. 19**] be **GRANTED**.[4]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).